# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS

| United States, | ) | |
| --- | --- | --- |
| *Plaintiff*, | ) | |
| v. | ) | Case No: 10 CR 50078-3 |
| Robert Presley, | ) | |
| *Defendant*. | ) | Judge Frederick J. Kapala |

## ORDER

Defendant's motion to lift the stay of proceedings [457] is granted. Defendant's supplemental motion for new trial [327] and motion for mistrial and to dismiss indictment [458] are denied. The parties are directed to contact the courtroom deputy to schedule a sentencing hearing.

## STATEMENT

After a June 2012 jury trial, defendant, Robert Presley (a.k.a. "Munchie" or "Big Munchie"), and his co-defendants, Steven McDowell and Jeremy Cooper (a.k.a. "J.D."), were found guilty of conspiracy to distribute heroin in violation of 21 U.S.C. § 846. Presley was also found guilty of possessing firearms after having previously been convicted of a felony in violation of 18 U.S.C. § 922(g), and of possession of firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(a). Two other co-defendants, Murray Harris and Norman Breedlove, pled guilty to the heroin conspiracy charge prior to the trial, each admitting that he conspired with his co-defendants to distribute more than a kilogram of heroin. Yet another co-defendant, Melvin Jordan, was acquitted by the jury. Before the court are Presley's motion to lift the stay of proceedings, his supplemental motion for a new trial, and his motion for mistrial and for dismissal of the indictment with prejudice. For the following reasons, the motion to lift the stay is granted and the other two motions are denied.

### I. BACKGROUND

On May 24, 2012, Breedlove pled guilty to the heroin conspiracy charge and to possessing a firearm in furtherance of a drug trafficking crime pursuant to a plea agreement governed by Federal Rule of Criminal Procedure 11(c)(1)(C). Under the terms of the plea agreement, Breedlove agreed to provide complete and truthful testimony in any criminal proceeding in which he was called upon to cooperate. The government, in turn, agreed to move for a departure from the applicable guidelines range and statutory minimum sentence of twenty-five years and to recommend a sentence of ten years if it determined that Breedlove complied with his cooperation agreement. Breedlove also agreed to postpone his sentencing until his cooperation was concluded. The court accepted

Breedlove's guilty plea, finding it knowing and voluntary, and scheduled Breedlove's sentencing hearing for August 24, 2012.

The jury heard the case on June 4 through June 14, 2012. In addition to Breedlove's testimony implicating his co-defendants in the heroin conspiracy, the government presented other testimony establishing the existence of a heroin conspiracy and Presley's participation in the conspiracy. Detective Gabe Wassner testified to nine controlled purchases of heroin from McDowell or Harris between August 24 and December 8, 2010. These purchases were arranged by Detective Wassner and McDowell in recorded telephone conversations which were played for the jury. Detective Wassner also made controlled purchases of heroin from Breedlove, who worked for McDowell.

McDowell's mother, Donia McDowell, testified that she lived in an apartment at 501 Longwood Avenue, Rockford, Illinois. Donia ultimately made an in-court identification of Presley, whom she knew as Munchie, but denied making a plethora of statements to law enforcement agents on December 2, 2012, indicating that McDowell, Presley, Cooper, and Harris were engaged in a heroin distribution conspiracy. Donia also denied, or said she could not recall, making similar statements while under oath before the grand jury. The court admitted as substantive evidence Donia's grand jury testimony in which she stated that Presley and Cooper sold heroin from a green rental car parked near 501 Longwood and that they were partners with Harris and McDowell, the latter being the financier of the operation. During her grand jury testimony, Donia also indicated that on December 1, 2010, there was a shootout at 501 Longwood during which she saw Presley with a handgun and Cooper with a long gun.

Vaughn Johnson lived in another apartment at 501 Longwood and made an in-court identification of Presley, Cooper, and McDowell. Johnson denied knowing anything about Presley, Cooper, and McDowell selling drugs but acknowledged that he probably said so in his grand jury testimony. Johnson testified at trial that he saw Presley and Cooper with guns on the night of the shootout.

Rodney Love testified that in November 2010 he would regularly visit Vaughn Johnson at his apartment at 501 Longwood. Love testified that McDowell, Presley, and Cooper were engaged in a heroin business at 501 Longwood and he identified them in court. Love observed heroin being packaged in Donia McDowell's apartment and at one point he saw Donia get upset with Presley and Cooper and tell them to leave her apartment. Love was present at 501 Longwood on the night of the shootout and saw Presley with a handgun and Cooper with a long gun. According to Love, the shooting was due to a dispute over some guns between Fred White, on the one hand, and Presley and Cooper on the other.

Other evidence showed that a search warrant executed in October 2010 at 1209 Chestnut Street, Rockford, which Frank and Paul Freeman rented to Presley for $100 per month to sell heroin, led to the recovery of quantities of heroin and a loaded 9mm Smith & Wesson handgun. According to Frank Freeman, Presley approached him about renting the house to sell heroin about nine or ten days before the search warrant was served. Freeman testified that Presley personally paid Freeman the rent and that Cooper was Presley's right hand man. Documents with McDowell's, Presley's, and Cooper's name on them were recovered from a black Dodge Charger with Illinois registration

number K96 5924 located at that address including the rental agreement for that vehicle in McDowell's name.

Heroin addict Charles Dixon testified that on three occasions Presley gave him free samples of heroin while outside of 501 Longwood. Later, Presley asked Dixon how he liked the heroin.

Detra White identified Presley and Cooper and testified that she bought drugs at 501 Longwood from Cooper, who she knew as J.D. A couple days before the shootout, Detra retrieved a handgun from her garage and brought it to 501 Longwood where she handed it to Cooper who in exchange gave her $80 and $20 worth of crack cocaine. Later that night, Presley and Cooper drove Detra to her garage where she retrieved a rifle. Detra brought it back to the car and Presley grabbed the rifle. In exchange for the rifle, Cooper gave Detra $30 worth of crack and $6 in cash.

Officers described their use of confidential informant Nicholas Real to purchase heroin from Cooper at 501 Longwood on November 24, 2010 and November 29, 2010. On each occasion, Real purchased three $20 bags of heroin. The bags also contained a Dormin pill, a common mixing agent that is packaged with heroin. On the latter date, Cooper arrived at 501 Longwood in a dark green Toyota Camry with Florida registration number 509 LAP. Officers also testified that on numerous occasions during the course of their investigation they observed Presley and McDowell on the premises at 501 Longwood. Detective Berg of the Winnebago County Sheriff's Department described a controlled purchase of heroin that Nick Real made from Presley and Cooper on December 2, 2010, in a Wal-Mart parking lot. Cooper and Presley arrived at Wal-Mart in the green Toyota Camry with Florida registration number 509 LAP. Real got into the Camry and then emerged with three bags of heroin that he purchased for $60. Real testified at trial and also described the three controlled purchases of heroin from Cooper and indicated that there was an African-American male passenger in the front seat of the Camry that Cooper was driving on December 2, 2010, but he did not get a good look at him.[1] FBI Special Agent Craig Smith testified that Presley was present with Cooper.

On December 2, 2010, Presley and Cooper were arrested in a green Toyota Camry with Florida registration number 509 LAP in the parking lot of the Studio Plus Hotel. Cooper was driving, Presley was the front-seat passenger and Wendell Haywood was in the backseat. Inside the green Toyota, police found a loaded .45 caliber Glock handgun on the floorboard behind Presley's seat and three small knotted baggie corners containing heroin. A forensic firearms examiner determined that the .45 caliber shell casings recovered from inside 501 Longwood after the December 1, 2010 shootout came from the .45 caliber Glock recovered from the floorboard of the green Toyota behind Presley's seat.

The Studio Plus Hotel manager testified that Kelly Coleman was registered to room 221 and Presley was registered to room 312. The rooms were paid for in cash on a daily basis by Coleman, Cooper, or Presley, but most often by Presley. Police searched room 221, which was occupied by Kelly Coleman and her three children, and located: $1027 in cash, 0.4 grams of heroin, 12 individually packaged baggies of heroin, a camera, an insurance identification card in Steve McDowell's name, a .40 caliber Taurus handgun, and the magazine for a .45 caliber Glock handgun.

---

[1] Robert Presley is an African-American male.

3

Various photographs and videos were recovered from Coleman's digital camera showing large sums of cash in room 221 and Coleman, Cooper, and others in and around the black Dodge Charger with Illinois registration K96 5924. A search of Presley's room revealed an AK-47 rifle, the loaded magazine for that rifle, bottles of lactose, two magic bullet grinders, a razor blade, a box of sandwich bags, latex gloves, a digital scale, the box from a bottle of Dormin pills, $620 U.S. currency, Western Union receipts in Presley's name, and DUI court paperwork in Presley's name indicating that Presley was driving a 2010 black Dodge Charger with registration number K96 5924 when he was arrested on November 5, 2010.

Kelly Coleman testified that Cooper is the father of her three children and Presley is Cooper's friend. Coleman said she came out to Rockford from Chicago in October 2010 to seek low income housing which she heard was cheaper in Rockford than in Chicago. They stayed in the Studio Plus Hotel and Presley paid for their rooms with cash. Coleman claimed that she did not know anything about Presley and Cooper selling heroin or where all the money came from that is being handled on the video and photographs recovered from her camera. When confronted with her grand jury testimony, during which she testified that Cooper was selling drugs for Presley, Coleman said she did not remember giving that testimony. Coleman's grand jury testimony was admitted at trial as substantive evidence. Coleman testified that Presley put the handgun and the heroin in room 221 which the police recovered.

Murray Harris' former girlfriend, Alycia Binion, testified that during the week before December 8, 2010, she had a telephone conversation with Harris. Harris told Alycia that Munchie, one of Harris' guys, got locked up. Alycia said she met Munchie once and identified Presley as Munchie in open court.

McDowell testified on his own behalf and denied being in a heroin distribution conspiracy with Presley and Cooper. Instead, McDowell admitted to delivering heroin on six different occasions between April 2010 and December 8, 2010, but claimed that he was working only with his brother Harris. McDowell said that he turned the heroin operation over to Harris at the end of June 2010. McDowell testified that he met Presley and Cooper in August 2010 when he went to the Longwood residence and Presley and Cooper were there with Harris. McDowell explained that he would check on his mother at the Longwood residence once a day and saw Presley and Cooper there sitting in a car three or four times a week.

Melvin Jordan also testified on his own behalf and denied being the heroin conspiracy's "tester." However, he admitted that he is a heroin addict and in the summer of 2010 he bought his heroin at 501 Longwood from Harris and McDowell. Jordan also acknowledged that in an interview prior to his arrest, he told Agent Smith that he also bought heroin from a person named "Munchie" and a person named "J.D" and that what he told agent Smith was the truth.

The jury returned its verdicts on June 14, 2012, and Presley's sentencing hearing was scheduled for September 18, 2012. Presley's post-trial motion for judgment of acquittal or for new trial was denied on July 24, 2012.

On August 16, 2012, Breedlove's attorney filed a "motion for mental examination of the defendant" in which he averred that Breedlove had recently begun "exhibiting signs of paranoid delusions." The court granted the motion on September 14, 2012. The same day, the court granted

Presley's unopposed motion to continue his sentencing hearing which was reset to November 2, 2012.

On October 18, 2012, prior to his own sentencing hearing, Presley filed a supplemental motion for a new trial pursuant to Federal Rule of Criminal Procedure 33. In that motion, Presley contended that sometime after he filed his original motion for new trial, but before this court ruled on that motion on July 24, 2012, while both he and Breedlove were confined at the Ogle County jail, Breedlove told Presley that he testified falsely at his trial.[2] Presley's supplemental motion was supported by his own affidavit as well as the affidavit of Ogle County Sheriff's Deputy Rick Krug. Presley's affidavit provided in relevant part:

> 5. Sometime in mid-July, 2012, Norman Breedlove was placed in a cell on my tier close enough for us to have a conversation.
>
> 6. I began to inquire of Breedlove why he testified against me at my jury trial in June, 2012.
>
> 7. During that conversation, Breedlove admitted that he 'did not know me like that,' which I took to mean in the context of our conversation that he did not know me to be involved in any drug conspiracy.
>
> 8. During that conversation, Breedlove apologized to me for testifying against me at trial, and stated that he only testified against me because the 'government kept threatening me with natural life for that girl's death' and that the 'government forced my hand by threatening me with life.'
>
> 9. During that conversation, Breedlove further stated that he testified against me because as he stated 'my hand was forced because I wasn't going down for that murder.'
>
> 10. During that conversation, Breedlove stated 'I know you wasn't part of the conspiracy' and 'I don't even know you like that.'

Krug's affidavit provided in relevant part:

> 2. Sometime in mid-July, 2012, I was conducting my rounds in G-block at the Ogle County Jail, I was called over by inmate/federal detainee Robert Presley regarding a conversation he was having with a co-defendant in another cell who was also an inmate/federal detainee named Norman Breedlove.
>
> 3. I stood and listened to the conversation for a period of time as Presley questioned Breedlove regarding Breedlove's testimony at Robert Presley's trial.
>
> 4. At several points during the conversation I overheard Breedlove make statements to the effect of 'man I never met you and don't know you,' 'I don't know who you are,' 'I don't even know you or who you are.'

---

[2]In his supplemental motion for new trial, Presley did not contend that the government knowingly presented false testimony.

5

5. When asked by Presley about why Breedlove testified against Presley at trial I overheard Breedlove respond 'they offered me a deal and I took it & what would you do.'

6. When asked by Presley about why Breedlove testified at Presley's trial that Presley was a member of a conspiracy I overheard Breedlove respond 'how would I know that if I don't even know you.'

On December 14, 2012, the parties appeared before the court and Presley indicated that he intended to call Breedlove as a witness at the hearing on his supplemental motion for new trial, but noted that Breedlove's competence was under consideration. The court stayed the proceedings on Presley's supplemental motion for new trial until Breedlove's competency was determined.

On February 6, 2013, based on the report of David M. Szyhowski, Psy.D., this court found that Breedlove suffered from a mental disease or defect rendering him mentally incompetent to the extent that he was unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. Consequently, this court committed Breedlove to the custody of the United States Attorney General to determine whether there was a substantial probability that in the foreseeable future he would attain the capacity to permit the proceedings to go forward.

On August 7, 2013, this court conducted a Sell hearing on the Bureau of Prison's ("BOP") request to involuntarily medicate Breedlove in order to restore him to fitness. Dr. Maureen Reardon, a BOP forensic psychologist at the Federal Medical Center in Butner, North Carolina ("FMC Butner"), testified that she conducted a forensic evaluation of Breedlove in consultation with BOP psychiatrist Dr. Sarah Ralston. The doctors diagnosed Breedlove with a psychotic disorder not otherwise specified and explained that he suffers from fixed delusions that there is an elaborate conspiracy between law enforcement, courtroom officials, his former attorney, and correctional staff, not only to conceal exculpatory evidence but also to compromise his physical and mental health to prevent him from prevailing in his case or to coerce him into accepting a plea bargain. As a result, Breedlove is unable to engage in meaningful discussion of his case with his attorney without referencing and over-focusing on his delusional beliefs. When asked if she or Dr. Ralston had an opinion as to the date of the onset of Breedlove's psychosis, Dr. Reardon said, "[a]s best as we can gather from the available data, writings that he has generated, observations, it's most likely dating back ten to eleven months, at least 'til last year," and that "it's plausible that they date back to 2008." At the conclusion of the Sell hearing the court took the matter under advisement and ordered post-hearing briefing. In an order entered on October 21, 2013, this court granted the request to involuntarily medicate Breedlove in order to render him competent to be sentenced. Breedlove appealed and this court stayed its order pending Breedlove's appeal which remains pending before the Seventh Circuit.

On November 20, 2013, Presley moved to lift the stay on the proceedings, which was intended to allow the BOP to attempt to restore Breedlove to fitness, and to proceed on his motions for new trial and for mistrial and to dismiss the indictment with prejudice despite Breedlove's unavailability as a witness. The motion to lift the stay is granted and the court will consider the other motions.

## II. ANALYSIS

Presley advances two grounds in support of his motions for a new trial or a mistrial: (1) that Breedlove was not mentally competent to testify at his trial, and (2) that Breedlove testified falsely at the trial and the government knowingly presented his false testimony.

A lengthy analysis is not required to conclude that Presley's first ground is without merit. Prior to August 16, 2012, when Breedlove's attorney filed a "motion for mental examination of the defendant," there was no indication that Breedlove was suffering from any mental disease or defect. In fact, thirteen days before Breedlove testified at his co-defendants' trial, Breedlove's attorney assured the court at Breedlove's change of plea hearing that "Norman has I think an understanding and grasp of the issues involved, what he's charged with, the consequences of his plea, and I have no doubt he's competent and able to make a knowing and voluntary plea." Based on this assurance and Breedlove's responses to the court's inquiries, this court found that Breedlove's guilty plea was knowing and voluntary. In fact, even the psychiatric experts who assessed Breedlove and later testified at his Sell hearing could not pinpoint the onset of Breedlove's inability to understand the nature and consequences of the proceedings against him or to assist properly in his defense. All they could say was that it most likely dated back ten to eleven months, but that it was possible that it dated back to 2008. However, even assuming that Breedlove was not competent to proceed with his own case at the time he testified at the trial of his co-defendants, that does not disqualify him as a witness or demonstrate that he was incapable of telling the truth and of appreciating the significance of his oath as a witness. See Fed. R. Civ. P. 601, advisory committee note (noting that there is no mental capacity qualification for testifying as a witness). In any event, the sheer volume of evidence the government mounted against Presley and his co-conspirators, which is outlined below, renders harmless any error in failing to recognize Breedlove's incompetence during the trial. Therefore, Presley's first advanced ground for affording him a new trail or a mistrial is rejected.

As for Presley's second ground, the standards for obtaining a new trial, or mistrial, based on a claim that a government witness committed perjury is very different depending on whether the contention is that the government presented the perjured testimony knowingly or unknowingly. See United States v. Ogle, 425 F.3d 471, 476 (7th Cir. 2007). "[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976). On the other hand, when the false testimony is unknowingly presented by the government the defendant has a much more difficult burden. In that circumstance, defendant must show that the evidence that was presented at the trial "'would probably have led to an acquittal had [the perjured testimony] not been heard by the jury.'" United States v. Womack, 496 F.3d 791, 796 (7th Cir. 2007) (quoting United States v. Mitrione, 357 F.3d 712, 718 (7th Cir. 2004)).

In his motion, Presley writes:

Breedlove's own statements, including the recantation of his testimony to Defendant and the Ogle County Jailer (Rick Krug) as well as his statements in his pro se pleading filed in this case suggest that his testimony at trial and during his plea

7

colloquy was false, and that the government knew it was false when it put Breedlove on as a witness.

First, nothing in Presley's or Krug's affidavits describing Breedlove's purported recantation of his trial testimony demonstrates that the government had any knowledge that Breedlove's trial testimony was false. As for Breedlove's pro se pleading, Presley points to the following four excerpts from Breedlove's motion for substitute counsel filed on July 29, 2013:

> The circumstances; was appropriate for the court to (must) explain the elements of the crime and relevand [sic] conduct, legal principles. I clearly told Nelson, and the Prosecutor's during the plea bargaing [sic], testmony [sic], and at the out-set of the hearing, that I (never) did not aid and abet Mcdowell, Harris or the other's. I never worked for or was paid by Mcdowell, Harris or the other's; I never worked for or was paid by McDowell, Harris or the other's.

(Dkt. No. 387, p. 38.)

> On or around 5/22/12 (before 5/24/2012) Nelson wented [sic] over the first plea agreement with me. I told Nelson that agreement was lies.
>
> Nelson brung a second agreement. And after he read the first two pages, I told hem [sic] I wanted to go to trial. That the latter Plea was worst [sic] than the first.

(Dkt. No. 387, p. 26.)

> We, N. Breedlove and Nelson all during the "One" time Nelson so-call review the facts of the first and only agreement Nelson went over with N. Breedlove, and the only one N. Breedlove was able to view due to stress and mental defect. And I told Nelson, that the factual basis of the Plea, was all lies, and the elements of the Rule 11 inquiry so so, I am surprised and confused by the Court. I told Nelson over, and over, and over, and over, and over, and over, and over again that I want to goo [sic] to trial. And I never admitted to the offense count one designated in the agreement, I Even made that clear to the court at the out-set of the Plea hearing.

(Dkt. No. 387, p. 40-41.)

> I told my Attorney, John M. Nelson from as early as 3/2011, that I want to go to trial, and that I never wanted to Plea guilty to Count One of the Federal indictment, because I was 100% innocent of the charge.

(docket No. 387, p. 24.)

Even assuming the truth of Breedlove's last three assertions, they do little to address the government's knowledge of the truth or falsity of Breedlove's trial testimony.[3] As for the first excerpt, even if the court assumes that it is true and reads it as an assertion that during plea

---

[3] Breedlove's assertion that he made it clear at the outset of the change of plea hearing that he never admitted to the offense alleged in Count I is not supported by the record of proceedings from May 24, 2012.

8

negotiations Breedlove told the attorney for the government that he was not a member of the McDowell heroin conspiracy, Breedlove later pled guilty and agreed to a factual basis establishing his membership in that conspiracy. If the government were not permitted to believe and present the testimony of a cooperating co-defendant who initially denies the charges, but then pleads guilty and agrees to cooperate by testifying against his co-defendants, the government would rarely if ever be allowed to present the testimony of a cooperating co-defendant. Furthermore, the first excerpt, more concisely stated is: I never aided or abetted, worked for, or was paid by, the heroin conspirators. Aside from the legal conclusion that he did not aid or abet, the factual assertions that he never worked for of was paid by the conspirators is not inconsistent with the factual basis presented at Breedlove's change of plea hearing or his trial testimony. A portion of the factual basis, and clarification by Breedlove, were as follows:

> MR. KARNER: Yes, your Honor. Defendant worked with Steve McDowell and others in an organization that distributed heroin throughout Rockford, Illinois. Beginning in April of 2010 and continuing until October 22nd, 2010, defendant was supplied with 500 packs of heroin by Steve McDowell and Murray Harris at least two to three times per week. A 500 pack is a distribution unit of heroin that consisted of 25 individual packets of heroin. Defendant then sold 25 individual packets of heroin to heroin users. Upon completing the sale of a 500 pack, the defendant received $150.
>
> . . . .
>
> THE COURT: Have you heard the statement of the Assistant United States Attorney?
>
> DEFENDANT BREEDLOVE: Yes.
>
> THE COURT: Is it correct?
>
> MR. NELSON: Judge, if I might. As I said, we've had many revisions of the plea, and it is correct, but my client wanted to clarify two points. One, the point where he was supplied with heroin by Mr. McDowell and others. He certainly was. But consistent with his proffer, he purchased that. That's how he was supplied. He purchased it, and I believe he will testify that he purchased it for 350, sold for 500, and then was able to claim a profit of $150.

Similarly, Breedlove testified at trial that he bought $500 packs of heroin from McDowell for $350 and that he would sell some and use some. Therefore, there is no factual content in the first assertion that differs from the Breedlove's trial testimony such that it constitutes evidence that the government knowingly presented false testimony. As for the legal conclusion in his first assertion that he did not aid or abet the conspirators, Breedlove does not deny his own conduct as stated in the factual basis or in his trial testimony. The attorney for the government was not obligated to accept Breedlove's legal conclusion that his conduct did not constitute conspiracy to distribute heroin and the fact that Breedlove erroneously thinks so is not evidence that the government knowingly presented false testimony. Therefore, the excerpts cited by Presley do not demonstrate that the government had knowledge that Breedlove's trial testimony was false. An accusation like Presley's, that the attorney

for the government knowingly presented false testimony, is a serious matter that should not be casually made without a good-faith basis to believe that it occurred. See Magnotta v. Berry, 906 F.Supp. 907, 928 (S.D. N.Y. 1995) (noting that counsel should only level such serious accusations as the prosecutor suborned perjury if there is evidence to substantiate them).

Because there is insufficient evidence that the government knowingly presented false testimony, this court must apply the Mitrione test. In light of Breedlove's unavailability, and Presley's insistence that the court proceed on his motions, the court will be unable to determine whether Breedlove did recant his trial testimony and if so whether he did so because his trial testimony was actually false or because he felt threatened by Presley.[4] Consequently, the court is left to assume without deciding that Breedlove's trial testimony was false and determine whether Presley probably would have been acquittal had the jury not heard Breedlove's testimony.

The evidence against Presley, apart from Breedlove's trial testimony, was legion and it overwhelmingly established that between April 1, 2010 and December 8, 2010, he, McDowell, Cooper, and Harris knowingly and intentionally agreed with one another, as well as with others, to possess and distribute heroin in Rockford. For example, although it came with obvious reluctance, McDowell's own mother Donia McDowell and her boyfriend Vaughn Johnson provided trial and grand jury testimony which demonstrated that McDowell, Presley, and Cooper operated a heroin distribution operation from 501 Longwood and that Presley had a handgun in his hand during the Longwood shootout on December 1, 2010. The next day, Presley and Cooper drove the green Toyota Camry to Wal-Mart and delivered heroin to Nick Real. Presley and Cooper were arrested shortly afterward in that same green Toyota Camry at the Studio Plus Hotel with three retail size heroin baggies in the car and with a .45 caliber Glock handgun behind Presley's seat which fired shots the day before during the Longwood shootout. Rodney Love also indicated that Presley was engaged in the heroin distribution business at 501 Longwood and had a handgun on the night of the shootout. In addition, Charles Dixon testified that Presley gave him free samples of heroin while outside of 501 Longwood and Frank Freeman made clear that it was Presley who paid him the rent in exchange for use of his house in furtherance of the heroin operation.

Presley and his co-defendants have complained about the quality of the witnesses that implicated them in the heroin conspiracy calling them drug addicts and "a rogue's gallery of felons." However, any such deficiencies were made up for with the massive amount of evidence corroborating their testimony that Presley was part of the conspiracy. For example, when the police executed a search warrant at the Freeman residence and found heroin and a firearm, the black Dodge Charger parked on the premises was searched revealing documents in Presley's name and indicating that the vehicle was rented by McDowell. Presley was driving that same black Dodge Charger in October 2010 when he was arrested for DUI and that same black Dodge charger appears in the video and photographs on Coleman's camera recovered from room 221 of the Studio Plus Hotel. Presley

---

[4]Contrary to Presley's assertion that "nowhere in any of the pro-se [sic] submissions by Breedlove does he indicate that Presley ever threatened him or made him feel uncomfortable," the theory that Breedlove may have felt threatened by Presley finds support in the pro se notice of appeal that Breedlove filed on July 31, 2012. (Dkt. No. 281.) In the penultimate sentence of that document, Breedlove wrote: "I am asking the court to please not place me in close proximity to co-defendants McDowell, Robert Presley, Jeremy Cooper, and Harris."

10

was present when Cooper delivered heroin to Detra White in exchange for firearms and the shootout was the result of a dispute over those firearms. When searched, Presley's hotel room was found to contain an AK-47 rifle as well as a large amount of heroin packaging materials and equipment. In addition, Coleman testified before the grand jury that Cooper was selling drugs for Presley. At trial, Coleman testified that Presley put the handgun and heroin in room 221 and that Presley paid cash for the room in which she and Cooper's children stayed.

Moreover, even the testimony of co-defendants McDowell and Jordan corroborate the other testimony and evidence implicating Presley as a member of the heroin conspiracy. McDowell candidly admitted to conspiring with Harris to distribute heroin, claimed that he turned the operation over to Harris, and acknowledged that Harris ran the operation out of 501 Longwood and that Presley and Cooper were there with Harris. McDowell testified that he observed Presley and Cooper sitting in a car at 501 Longwood corroborating the testimony that they sold heroin out of a parked car near 501 Longwood. Jordan denied that he was a member of the heroin conspiracy but testified that he bought heroin at 501 Longwood.

The fact that in its order denying defendants' motions for a judgment of acquittal this court indicated that Breedlove's testimony alone, if believed, was sufficient to support the jury's determination that Presley was a member of the conspiracy does not mean that the evidence was lacking absent Breedlove's testimony. In fact, Breedlove's trial testimony as to Presley's involvement in the conspiracy was limited. Breedlove indicated that one of the individuals present at 501 Longwood was a person known to him as "Munchie" and he remembered one occasion where Harris told Presley to take Breedlove's money and get him a pack of heroin. Breedlove also recalled an occasion where Presley was confused as to whether Breedlove was purchasing or being fronted heroin. On cross-examination, Breedlove even equivocated about Presley's involvement. In any event, as explained above, even without Breedlove's testimony the evidence that Presley was a member of the charged heroin conspiracy and used a firearm in furtherance of a drug trafficking crime was overwhelming. Therefore, under the Mitrione test this court cannot say that Presley probably would have been acquitted had the jury not heard Breedlove's testimony.

Finally, the court denies Presley's request for an evidentiary hearing. Presley contends that such a hearing is necessary because he did not have standing to participate in Breedlove's Sell hearing and therefore was not afforded the opportunity to cross-examine Dr. Reardon or Dr. Ralston to establish that Breedlove was incompetent when he testified at trial. For purposes of the foregoing analysis, however, the court has assumed that these medical professionals did opine that Breedlove was incompetent to proceed with his own case at the time he testified at trial but the court determined that this circumstance did not disqualify Breedlove as a witness or demonstrate that he testified falsely. Presley also contends that an evidentiary hearing is necessary to establish that Breedlove did in fact recant his trial testimony in Presley's and Krug's presence. Once again, however, for purposes of this analysis the court assumed as much but has concluded that Presley has failed to demonstrate that without Breedlove's trial testimony he probably would have been acquitted.

## III. CONCLUSION

For the foregoing reasons, Presley's motion to lift stay of proceedings is granted. Presley's supplemental motion for new trial and motion for mistrial and to dismiss indictment are denied.

Date: 6/3/2014

ENTER:

_____

FREDERICK J. KAPALA

District Judge